## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

_____

|  |  |  |
|---|---|---|
| **URBAN ONE, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 8:25-cv-02850-LKG |
| | ) | |
| **MICK UNPLUGGED, LLC and** | ) | |
| **MICK D. HUNT, JR.,** | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MOTION TO DISMISS COMPLAINT

The defendants, Mick Unplugged, LLC, et al., and Mick D. Hunt, Jr., by and through undersigned counsel, Samuel Q. Elira Sr. and THE ELIRA LAW FIRM, LLC., pursuant to Fed. R. Civ.P.12(b)(b)(6) hereby move this Court to dismiss the Complaint in its entirety with prejudice as the plaintiff has failed to state a claim upon which relief can be granted. In support thereof, the defendants state the following:

### FACTS

1.      According to the Complaint, the plaintiff is a media company that provides content through radio, television, and digital platforms. Mr. Hunt is the host and producer of a podcast entitled "Mick Unplugged." In August 2024, Mr. Hunt was introduced to the plaintiff as an up-and-coming podcast talent with a new show concept. According to the plaintiff, "Prior to that date, the Podcast had demonstrated purported rapid growth in downloads and audience engagement." The plaintiff understood that "Downloads and audience engagement are the primary metrics used to measure a podcast's reach and success." Without more, "Urban One relied on the

purported success of the Podcast in entering into negotiations with Defendants to distribute the Podcast on Urban One's platform."

2.      According to the Complaint, in reliance on the download metrics presented by Mick Unplugged on August 27, 2024, the parties entered into a Podcast License Agreement ("Initial Agreement"). Mr. Hunt signed the Initial Agreement for Mick Unplugged. The Initial Agreement granted the plaintiff the exclusive rights to the Podcast series "Mick Unplugged," including streaming on the plaintiff's digital streaming platform. Mick Unplugged retained "the right to exhibit the Licensed Content on Licensor's owned and operated YouTube channel known as Mick Unplugged. With the exception of Mick Unplugged's Branded Digital Service, Mick Unplugged granted the plaintiff "an exclusive license to sell, exhibit, distribute and exploit the Licensed Content in the Licensed Media for the duration of the License Period."

3.      The Initial Agreement expressly provided that Defendants only had independent exhibition rights on its "owned and operated YouTube channel known as Mick Unplugged." All other distribution and commercialization rights were exclusively held by the plaintiff. According the Complaint, the Initial Agreement required Mick Unplugged to deliver a minimum of one hundred and four (104) episodes of the Podcast per year. The Initial Agreement included an initial term commencing on August 27, 2024 and ending one year from the date of the initial exhibition, broadcast, or distribution of the licensed material (the "License Period"). The Initial Agreement obligated Mick Unplugged to upload to the plaintiff's distribution platform a minimum of two to three episodes of the Podcast each week. In

exchange, Mick Unplugged would receive a fifty percent (50%) share of the net revenues from the sale of ads within the Podcast for both the audio and video versions, and a sixty percent (60%) share of net revenues from host read ads.

4.    According to the Complaint, due to the importance of download and audience engagement data for the consideration provided to Mick Unplugged under the Agreement, Section 6.3 prohibited Mick Unplugged from artificially and/or fraudulently manipulating download and visibility data.

5.    The Complaint also alleges that on or about November 20, 2024, the plaintiff received an unsolicited communication from its third-party analytics partner raising concerns regarding abnormal download and audience engagement behavior relating to the Podcast. The Complaint continued that "the communication raised several red flags related to the download and audience engagement patterns for the Podcast, including: (1) the Podcast had high download counts, but low listener counts; (2) a large number of the downloads of the Podcast were atypically directed to older episodes; and (3) a significant volume of the traffic was attributed to "iTunes," a legacy platform Apple had discontinued in favor of Apple Podcasts." These issues suggested to the plaintiff that the download data for the Podcast were being manipulated to show high growth that did not reflect actual audience engagement.

6.    The plaintiff claimed to have raised the issues identified by the third-party analytics partner with Mick Unplugged, who "represented [that] the unusual volume of downloads of older episodes could be attributed to ongoing guest promotion that Defendants asserted drove traffic to older episodes" and that the plaintiff's "hosting platform was incorrectly reporting Apple traffic as being from

iTunes." The plaintiff alleged that it could not test these representations because at that time it did not have access to Apple Podcast analytics.

7.    The plaintiff alleged to have "accepted and credited the explanations and representations . . . and continued with the business relationship based on those representations." When the plaintiff , nearly one year later given access to their Apple Podcast analytics (in May 2025), it "discovered that in November 2024, the Podcast only had 772 engaged listeners on Apple Podcasts despite having 1.1 million downloads." The plaintiff concluded that the "number of engaged listeners was abnormally low for such a high number of downloads, confirming the concerns raised by" its third-party analytics partner, who was unsolicited.

8.    The plaintiff also alleged that on or about March 4, 2025, Mick Unplugged indicated that it "had been receiving multiple offers for distribution of the Podcast from other podcast networks, including significant annual guarantees." According to the plaintiff, these discussions alone "violated Urban One's exclusive rights under the" Agreement. Nevertheless, Mick Unplugged further indicated that the compensation provided by the plaintiff under Agreement was "not even close" to third party offers and questioned its decision to join the plaintiff's network. In those March 2025 conversations, according to the plaintiff, Mick Unplugged "relied on the reported high download metrics for the Podcast to justify their demands for greater compensation." Mick Unplugged also expressed interest in starting their own podcast network as a subnetwork on the Urban One platform. To address "Defendants' concerns regarding the [Initial] Agreement, and in express reliance on Defendants' representations regarding the Podcast's high download metrics representing authentic

audience engagement and high visibility, the parties entered into negotiations regarding an amendment to the Podcast License Agreement."

9.     Knowing everything the plaintiff already expressed to have known, on March 28, 2025, the parties entered into an amendment to the Initial Agreement. According to the Complaint, the plaintiff entered into the Amended Agreement to address Mick Unplugged's "concerns regarding their compensation under the Agreement and in an effort to forge a long-term relationship." Again, according to the Complaint, "[t]he Amendment was executed by Urban One in reliance on Defendants' representations that the Podcast's download metrics represented authentic audience engagement and visibility." The plaintiff, "expressly relied on Defendants' representations that the download metrics were organic and authentic (i.e., not manipulated or manufactured) in agreeing to the Amendment."

10.    The Amended Agreement extended the period of the contract to December 31, 2029, and increased Mick Unplugged's "revenue share such that Defendants received seventy percent (70%) of the net revenues from the sale of ads within the Podcast for the audio version and sixty percent (60%) of the net revenues from the sale of ads within the Podcast for the video version." The Amended Agreement expressly provided that "nothing in this Amendment should be interpreted as invalidating the [Podcast License] Agreement, and provisions of the [Podcast License] Agreement will continue to govern relations between the parties insofar as they do not expressly conflict with this Amendment."

11.    As the number of downloads of the Podcast continued to rise, the plaintiff alleged that it noticed several additional red flags. First, the plaintiff alleged

that it noticed that Mick Unplugged "had no significant public notoriety or media presence <u>prior</u> to launching the Podcast that would explain the rapid and unusual growth shown for the Podcast. Second, the plaintiff also alleged that it noticed that Mick Unplugged's YouTube channel "displayed significantly lower viewership, inconsistent with the audience size suggested by the number of downloads." Third, the plaintiff also alleged to have noticed that Mick Unplugged's "social media accounts grew rapidly in a manner that suggested paid growth strategies." These factors, according to the plaintiff, indicated artificial manipulations of download metrics, and a significant misrepresentation of audience size and influence based on the number of downloads.

12.    Hence, on or about May 13, 2025, the plaintiff requested access to Defendants' Apple Podcast analytics, which access would allow for a deeper analysis of the Podcast's analytics, beyond mere download numbers, to evaluate actual audience engagement. Mick Unplugged granted the access. The plaintiff then alleged that its "analysis of that data confirmed that the actual listenership for the Podcast was significantly lower than, and inconsistent with, the download metrics." The data and analysis, according to the plaintiff, showed that Mick Unplugged "engaged one or more third party services to artificially increase the download numbers for the Podcast to falsely indicate high audience engagement and visibility for the Podcast."

13.    In late May 2025, the plaintiff alleged that it confronted (again) Mick Unplugged regarding the discrepancy between the large number of the downloads and low levels of actual audience engagement. According to the plaintiff, Mick Unplugged denied the allegations but "acknowledged using a third-party service called Audience

Lift to artificially enhance the number of downloads of the Podcast." The plaintiff alleged that Mick Unplugged "cutoff Urban One's access to their Apple Podcast analytics." The plaintiff concluded that Mick Unplugged's "manipulation of their downloads for the Podcast breached Section 6.3 of the Agreement and revealed as fraudulent their representations regarding downloads, audience engagement, and visibility of the Podcast."

14.    On or about May 30, 2025, the plaintiff (again) contacted Mick Unplugged "to further discuss the discrepancies between actual audience engagement compared to the high number of downloads." A few days later, Mick Unplugged "indicated that they could not continue producing the show based on the April revenue and demanded a sixty-five thousand dollar ($65,000) monthly upfront guarantee." According to the plaintiff, Mick Unplugged stated that if the requested guarantee was not received by June 6, 2025, it "would not fulfill their contractual obligations to deliver further episodes under the Agreements."

15.    The plaintiff further that (again) on or about June 9, 2025, Defendants revoked Urban One's access to the Apple Podcast analytics, which access had allowed Urban One to obtain the analytics related to the Podcast discussed above. And on or about June 11, 2025, Mick Unplugged removed Urban One's branding from the Podcast and replaced it with "Unplugged Studios." Further in violation of the plaintiff's alleged exclusive rights, Mick Unplugged began promoting the Podcast on social media platforms under the "Unplugged Studios" branding instead of the plaintiff's Urban One branding. And on or about June 19, 2025, Mick Unplugged released two episodes of the Podcast on a platform unaffiliated with the plaintiff. In

response to Mick Unplugged's alleged conduct, the plaintiff removed Mick

Unplugged's access to Urban One's OMNY distribution platform "out of a concern

that Defendants would use their access to remove their prior episodes from that

platform."

16.     The plaintiff then proceeded to summarize what it deemed to be Mick

Unplugged's breaches of their contract. The plaintiff alleged that Mick Unplugged's

alleged "manipulation of the number of downloads and other audience engagement

and success metrics for the Podcast," constituted a breach the Agreement. The

plaintiff then alleged that Mick Unplugged also violated the plaintiff's exclusive rights

to the Podcast by engaging a third-party to market the Podcast, by removing Urban

One's branding from the Podcast, by re-branding the Podcast with the "Unplugged

Studios" moniker, by engaging in discussions and activities with third party

distributors during the term of the Agreements, and by distributing the Podcast

through another platform. These, the plaintiff claims, also violated the implied

covenant of good faith and fair dealing.

17.     According to the plaintiff, Mick Unplugged also violated the warranty

not to impair the value of rights granted to the plaintiff, which again "violated the

implied covenant of good faith and fair dealing." Further, the Agreement provided that

other than the revenue share set forth in the Agreement all other revenue streams

belonged to the plaintiff. According the Complaint, Mick Unplugged breached their

representation and warranty and their obligations relating to revenue streams "based

on its breaches of Urban One's exclusive rights." Those breaches, the plaintiff alleged,

impaired and diminished the value of the rights granted to Urban One and violated the

implied covenant of good faith and fair dealing. Mick Unplugged also "breached the Agreements (including Section 11) and the implied covenant of good faith and fair dealing by allowing the contracting entity (Mick Unplugged) to be dissolved." Mick Unplugged "also anticipatorily breached the Podcast License Agreement by "refusing to provide additional episodes of the Podcast without the receipt of additional compensation not contemplated under the Podcast License Agreement." The plaintiff would also add that "[t]his conduct <u>also</u> violated the implied covenant of good faith and fair dealing."

18. According to the Complaint, on or about June 23, 2025, the plaintiff sent a letter to Defendants to exercise its right to terminate Agreements. Upon termination, "due to a default by Licensor, Licensor shall <u>refund to Company the pro-rated amount</u> of this Agreement based on the number of months remaining in the License Period.

19. In the event of termination, the Agreement obligated Mick Unplugged "to refund Urban One on a pro-rated basis for the losses to Urban One for the term of the Podcast License Agreement, caused by the improper conduct leading to termination." Section 14 of the agreement provides in part that "[i]f Company terminates this Agreement with respect to the Licensed Rights due to a default by Licensor, Licensor shall refund to Company the pro-rated amount of this Agreement based on the number of months remaining in the License Period." The plaintiff further alleged that "[s]ince the effective date of the Podcast License Agreement, Urban One's <u>average monthly net proceeds</u> under the Podcast License Agreement were approximately $35,197.11." Since the Amended Agreement provided that the contract

period would run until December 31, 2029, fifty-four (54) months remained in the

contract, and Mick Unplugged is obligated to pay to the plaintiff $1,900,643.94.

## DISCUSSION

**Standard for Motion to Dismiss**

20.    "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a

complaint; importantly, it does not resolve contests surrounding the facts, the merits of

a claim, or the applicability of defenses." Republican Party of North Carolina v.

Martin, 980 F.2d 943, 952 (4th Cir. 1992). When ruling on a 12(b)(6) motion, the

court must view the complaint in the light most favorable to the plaintiff and accept

the plaintiff's factual allegations, as well as all reasonable inferences therefrom, as

true. See Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); Martin, 980

F.2d at 952; Westray v. Porthole, Inc., 586 F.Supp. 834, 836 (D. Md. 1984). A motion

to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to "state a claim to

relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A

claim is facially plausible when the plaintiff pleads factual content that allows the

Court to draw the reasonable inference that the defendant is liable for the misconduct

alleged. Id. While the Court must accept all well-pleaded factual allegations as true, it

need not accept legal conclusions couched as factual allegations. Id. at 678–79. When

a complaint fails to plead facts sufficient to meet this standard, dismissal is required.

In addition, because the court is testing the legal sufficiency of the claims, the court is

not bound by the plaintiff's legal conclusions. Randall v. United States, 30 F.3d 518,

522 (4th Cir.1994); <u>Labram v. Havel</u>, 43 F.3d 918, 921 (4th Cir. 1995) (affirming

Rule 12(b)(6) dismissal with prejudice because plaintiff's alleged facts failed to

support her conclusion that the defendant owed her a fiduciary duty at common law);

<u>Faulkner Advertising. v. Nissan Motor Corp.</u>, 945 F.2d 694, 695 (4th Cir. 1991)

("[S]elf-serving, inaccurate legal conclusions cannot rescue a factually deficient

complaint"). For reasons stated in each section, the Court must as a matter of law

dismiss the plaintiff's Complaint in its entirety. None of the plaintiff's purported

claims make a claim upon which relief can be granted.

### **Breach of Contract**

21.     To be clear, the entire purpose of this lawsuit is to enforce the pro-rated

damages provision of the Agreement. This is a liquidated damages clause. In

<u>Massachusetts Indem. & Life Ins. Co. v. Dresser</u>, the Maryland Supreme Court stated

the test for the validity of an enforceable liquidated damages clause:

> (1) clear and unambiguous language providing for 'a certain sum';
> (2) stipulated damages that represent reasonable compensation for the
> damages anticipated from the breach, measured prospectively at the time
> of the contract rather than in hindsight at the time of the breach; and
> (3) a "mandatory binding agreement[] before the fact which may not be
>
> altered to correspond to actual damages determined after the fact."

269 Md. 364, 368-69 (1973).

22.     In <u>8621 Limited Partnership v. LDG, Inc.</u>, 169 Md.App. 214 (2006), the

Appellate Court of Maryland considered ambiguity in contract terms and reasoned

that "the primary source for determining the intention of the parties is the language of

the contract itself." Citing <u>Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs.</u>

<u>Ltd. P'ship</u>, 109 Md.App. 217, 290-91, <u>aff'd</u>, 346 Md. 122 (1997). The Court

continued that "[c]ontracts are interpreted objectively, which "means that the clear and unambiguous language of a written agreement controls[.]" Quoting First Union Nat'l Bank v. Steele Software Sys. Corp., 154 Md.App. 97, 171 (2003), cert. denied, 380 Md. 619 (2004). Language in a contract is considered "ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person." Maslow v. Vanguri, 168 Md.App. 298, 318 (2006). "To determine whether a contract is susceptible of more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.'" Id.

23.    Nevertheless, "'[a] court cannot enforce a contract unless it can determine what it is.'" See First Nat'l Bank v. Burton, Parsons & Co., 57 Md.App. 437, 450, cert. denied, 300 Md. 88 (1984) (quoting 1 Corbin on Contracts § 95). "An agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable." Maslow, 168 Md.App. at 322. Therefore, the parties to a contract "must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract." First Nat'l Bank, 57 Md.App. at 450 (quoting Corbin, supra ).

24.    Maryland courts have therefore consistently held that a contract is not enforceable unless it expresses with definiteness and certainty the nature and extent of

the parties' obligations and the essential terms of the agreement. Mogavero v. Silverstein, 142 Md.App. 259, 272 (2002), cert. denied, 369 Md. 181 (2002); Canaras v. Lift Truck Services, 272 Md. 337, 346 (1974); Meyers v. Josselyn, 212 Md. 266, 271 (1957); Robinson v. Gardiner, 196 Md. 213, 217 (1950). In other words, an agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable. Mogavero, 142 Md.App. at 27; L L Corp. v. Ammendale, 248 Md. 380, 385 (1968); Schloss v. Davis, 213 Md. 119, 123 (1957) (a "contract may be so vague and uncertain as to price or amount as to be unenforceable."). In Robinson, 196 Md. at 217, the Court addressed the requirement of contractual certainty, stating:

> Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties. See also Joseph M. Perillo, 1 Corbin on Contracts § 4.1, at 525 (Rev. ed. 1993) ("Corbin") ("Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract."); Restatement, § 33(1), at 92 ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain").

The "amount" in the "pro-rated amount of this Agreement" is not defined anywhere in either the Initial or Amended Agreement. The term is vague and indefinite, and the plaintiff recognized that fact. The plaintiff, therefore, sought to fill in this gap, to cure

this vagueness. The plaintiff has interpreted the term "amount" to mean "average monthly net proceeds." As the plaintiff calculated, this "average monthly net proceeds" will net the plaintiff "not . . . less than $1.9 million." But there is no basis in the Initial or Amended Agreement for this interpretation other than the plaintiff's interpretation.

25.    The word "amount" in this context is vague, indefinite, and uncertain. This uncertainty would require this Court or a jury to rewrite the contract for the parties, giving one party a benefit for which they did not bargain and delivering to the other party a detriment they did not intend. Furthermore, given this ambiguity, this vague term "amount," as used in this context, should  be construed against the maker, the plaintiff. See Empire Fire and Marine Ins. Co. v. Liberty Mut. Ins. Co., 117 Md.App. 72 (1996).

26.    Given this ambiguity, the Agreements are unenforceable. Its language is not sufficiently definite to clearly inform Mick Unplugged that it may be called upon to pay $1.9m to the plaintiff. The language must also be sufficiently clear and definite in order that this Court may be able to know the purpose and intention of the parties. "Vagueness of expression, indefiniteness and uncertainty" as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract because even though an offer was intended, its acceptance cannot be said to be clear so as to form a contract.

**Pro-Rated Damages for Breach of Contract**

27.    For Count II, labeled "Pro-Rated Damages" the plaintiff makes no specific factual allegations. The plaintiff merely repeated allegations previously made

in the general and narrative section of the Complaint and under Count I of the
Complaint.

28.    Courts have repeatedly held that a remedy or claim for relief is not a
cause of action. In <u>Fare Deals Ltd. v. World Choice Travel. Com, Inc.</u>, 180 F.Supp. 2d
678 (D. Md. 2001), the court held that "a request for injunctive relief does not
constitute an independent cause of action; rather, the injunction is merely the remedy
sought for the legal wrongs alleged in the nine substantive counts." Citing <u>Howell
Petroleum Corp. v. Leben Oil Corp.</u>, 976 F.2d 614, 622 (10th Cir.1992)(Similarly,
"[a] request for damages ... does not constitute a cause of action; rather damages are a
remedy for a legal wrong.") Citing <u>Thomas v. Casford</u>, 363 P.2d 856, 858
(Okla.1961). Other jurisdictions have similarly held that a request for an injunction or
for damages is not a cause of action but a remedy to a cause of action. In <u>Long v. Dell,
Inc.</u>, No. 12-248-Appeal at 23-24, the Rhode Island Supreme Court clarified that "[a]n
injunction is a remedy, not a cause of action." (Upholding the trial court's dismissal of
the plaintiff's request for injunctive relief). In so holding, the court recognized
authority from other jurisdictions which similarly hold that injunctive relief is not a
cause of action. See <u>Thompson v. JP Morgan Chase Bank, N.A.</u>, No. 13-2230, 2014
WL 1586992, at *1 n.1 (6th Cir. Apr. 22, 2014); <u>Koufos v. U.S. Bank, N.A.</u>, 939
F.Supp. 2d 40, 46 (D. Mass. 2013)). Without more, the Court must dismiss Counts II
of the plaintiff's Complaint for failing to state a claim for which any relief may be
granted.

**<u>Implied Covenant of Good Faith and Fair Dealing</u>**

29.     The plaintiff also pleaded what it calls "Implied Covenant of Good Faith and Fair Dealing." The plaintiff initially alleged that "[t]he Agreements include an implied covenant of good faith and fair dealing." Then, the plaintiff alleged that Mr. Hunt and Mick Unplugged "breached the implied covenant of good faith and fair dealing" through fraudulent and improper activity, including manipulation of the number of downloads and other audience engagement metrics for the Podcast, as well as violating Urban One's exclusive rights to distribute the Podcast and by allowing Mick Unplugged to be dissolved, which actions, even if some of them were not expressly barred by the Agreements, were designed to deny Urban One the benefits it bargained for under the Agreements." The plaintiff adds that as a result of Mr. Hunt and Mick Unplugged's "breach of the implied covenant of good faith and fair dealing," it has "suffered and will continue to suffer direct and consequential damages, including, but not limited to, the loss of revenue derived from the Podcast, and Urban One's reasonable attorneys' fees incurred in connection with this suit." In fact, throughout the Complaint, the plaintiff repeatedly pleaded "the Agreements and implied covenant of good faith and fair dealing," indicating the plaintiff's view that these are separate causes of action.

30.     In every contract, whether made explicit or not, there is an implied duty of good faith and fair dealing which imposes upon the parties to the contract an obligation that they not "act[ ] in such a manner as to prevent the other party from performing his obligations under the contract." Parker v. Columbia Bank, 91 Md.App. 346, 366 (1992). Emphasis added. But the implied covenant of good faith and fair dealing does not, in and of itself, support a cause of action for breach of contract. As

the Appellate Court of Maryland explained in <u>Mount Vernon Properties, LLC v.</u>

<u>Branch Banking And Trust Co.</u>:

> [T]here is no independent cause of action at law in Maryland for breach
> of the implied covenant of good faith and fair dealing. Although the
> issue has not been specifically addressed by the Maryland appellate
> courts, we agree with the circuit court that no such action at law exists in
> Maryland.

170 Md.App. 457, 471-72 (2007). The court would also find as "persuasive the

reasoning of the United States District Court in <u>Swedish Civil Aviation Admin. v.</u>

<u>Project Management Enterprises, Inc.</u>, 190 F.Supp. 2d 785, 794 (D. Md. 2002), that

"[t]he implied duty of good faith 'prohibits one party to a contract from acting in such

a manner as to prevent the other party from performing his obligations under the

contract.'"citing <u>Parker v. The Columbia Bank</u>, 91 Md.App. 346, 366, <u>cert</u>. <u>denied</u>,

327 Md. 524 (1992). One court in fact reasoned that since the Appellate Court of

Maryland "did not go further [in the Parker case] and rule that there is a duty requiring

affirmative steps beyond those required by the contract itself. Therefore, this duty is

merely part of an action for breach of contract, <u>Howard Oaks, Inc. v. Maryland Nat'l</u>

<u>Bank</u>, 810 F.Supp. 674 (D.Md.1993), and so, <u>because [one count] already states a</u>

<u>claim for breach of contract, [the count purporting to state a claim for breach of the</u>

<u>implied duty of good faith] does not state a different claim and will be dismissed</u>." <u>Id</u>.

Emphasis added. <u>See</u> <u>also</u> <u>Baker v. Sun Co.</u>, 985 F.Supp. 609, 610 (D. Md. 1997)

("Maryland does not recognize an independent cause of action for breach of the

implied contractual duty of good faith and fair dealing."); PAUL MARK SANDLER

& JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND,

§ 2.1 at 29 (3d ed. 2004) ("Maryland does not recognize . . . an independent cause of

action for breach of the implied contractual duty of good faith and fair dealing."). A breach of the implied duty of good faith and fair dealing is better viewed as an element of another cause of action at law, e.g., breach of contract, than as a stand-alone cause of action for money damages, and the court concluded that no independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing.

31.    While the plaintiff seemed to initially appreciate that the Agreements included an implied duty of good faith and fair dealing, the plaintiff proceeded to plead what appears to be a completely independent cause of action, complete with damages and attorney's fees for what it believes to be a separate cause of action. To be clear, the plaintiff's allegations under Count III relate solely to facts already raised in other parts of the Complaint. Since the implied duty of good faith and fair dealing is not an independent cause of action in Maryland, the Court must, as a matter of law, dismiss Count III of the Complaint.

**Unjust Enrichment**

32.     A contract implied in law, also known as a quasi-contract or a

constructive contract, is an obligation created by law for the sake of justice or to avoid

unjust enrichment. A contract implied in law operates as a valid contract for purposes

of remedy only. The general rules of contract do not apply to contracts implied in law.

A court cannot find a contract implied in law if there already exists a contract, either

express or implied, covering the same subject matter.

33.     In Maryland, a party cannot be successful in an unjust enrichment

lawsuit where that party also is claiming the existence of a contract or agreement. In

FLF, INC. v. World Publications, Inc., 999 F.Supp. 640 (D. Md. 1998), the defendant

brought a motion for lack of subject matter jurisdiction. The court reasoned that the

defendant, FLF, "plainly cannot maintain a claim for unjust enrichment." The court

held that "[i]t is settled law in Maryland, and elsewhere, that a claim for unjust

enrichment may not be brought where the subject matter of the claim is covered by an

express contract between the parties," citing MTA v. Granite Const. Co., 57 Md.App.

766, 776 (1984); First Nat'l Bank v. Burton, Parsons & Co., 57 Md.App. 437, 451

(1984), cert. denied. 300 Md. 90 (1984); see Attorney Grievance Commission v.

McIntire, 286 Md. 87, 93 (1979) ("once a contract ... is formed, its terms are to be

followed"). The court reasoned that unjust enrichment is a method for a party that

conferred a benefit without having a contract or agreement to be made whole. A party

that clearly received a benefit (whether money, items, or services) with the knowledge

of that benefit being conferred should not be able to receive a windfall of those

benefits simply because no contract was agreed-to. The court held that "[g]iven the

express contract between the parties here specifically providing that WPI would not be liable for severance payments, FLF's claim that WPI has been 'unjustly' enriched because it has not made those same payments is clearly without basis."

34.     In this instance, there is no dispute that the parties entered into a contract. The plaintiff has supplied a copy of the Agreements. The plaintiff has also cited and quoted copiously to the Agreements. To rely on the express Agreements for remedy and to also rely on another theory for the same recovery is clearly without basis.

**Fraudulent Inducement**

35.     Contracts governed by Maryland law can be <u>rescinded</u> based on the theory of fraudulent inducement. These issues were recently addressed by the Maryland Appellate Court in <u>Swinton Home Care, LLC v. Tayman</u>, 264 Md.App. 487 (2025). <u>Swinton</u> involved a home health care services provider's lawsuit against Lillian and Mary Tayman to recover amounts allegedly owed for services rendered to Mary pursuant to a signed agreement. In her defense, Lillian claimed that there were no valid agreements between the parties because she was fraudulently induced to <u>sign</u> a services agreement for in-home health care and nursing services and a guaranty agreement. During the trial, Lillian testified that prior to signing the agreement, she told the plaintiff's representative that she did not have power of attorney over Mary. She added that the plaintiff's representative told her she could sign the agreement in Mary's name without the power of attorney and that she could sign the guaranty in her own name. Based on these representations, Lillian signed both contracts. At the conclusion of the trial, the circuit court found that there was no enforceable contract

because Lillian was fraudulently induced to <u>execute</u> the original contract in Mary's name.

36.    On appeal, the Appellate Court of Maryland stated that "[f]raudulent inducement refers to 'a situation where a person is induced by some <u>fraudulent representation</u> or pretense to <u>execute the very instrument which is intended to be executed</u>.'" Emphasis added. The remedy for fraudulent inducement is <u>rescission</u>. "Rescission of a contract is the abrogation or unmaking of the agreement and the placing of the parties to it in status quo. Rescission is an extraordinary remedy that requires 'proof of justifiable reliance on a material misrepresentation.'"

37.    As discussed, the inducement in fraudulent inducement goes to the execution or making of the contract. This is certainly not the case in this case. The plaintiff did not plead anywhere in the Complaint that Mr. Hunt or Mike Unplugged induced the company into executing either the Initial Agreement or the Amended Agreement. Furthermore, the remedy for fraudulent inducement is rescission of the contract. This remedy reflects the wrong done. Since the wronged party was fraudulently induced to execute the contract, the law would allow the wronged party to leave the contract without liability. The plaintiff did not plead that Mr. Hunt or Mick Unplugged induced it, fraudulently or not, into executing either Agreement. The plaintiff also did not seek rescission as its remedy in this Complaint. Rather, the plaintiff sought liquidated damages based on a pro-rated basis going forward.

<u>**CONCLUSION**</u>

WHEREFORE, Defendants respectfully request that this Court dismiss Counts I–IV of Plaintiff's Complaint in their entirety pursuant to Fed. R. Civ. P. 12(b)(6),

with prejudice, and grant such other and further relief as the Court deems just and

proper.

**THE ELIRA LAW FIRM, LLC.**

/s/ Samuel Q. Elira Sr._____
Samuel Q. Elira Sr., Esquire
Md Bar No. 22164
3060 Mitchellville Road, Suite 216
Bowie, Maryland 20716
(301) 218-9400 (Office)
(301) 218-9406 (Fax)
sqelaw@gmail.com
*Counsel for the Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January 2026 a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties indicated on the electronic filing receipt. A copy of the foregoing will also be delivered by email to the following:

Andrew P. Zappia, Esquire
**TROUTMAN PEPPER LOCKE LLP**
Andrew P. Zappia (MD Bar No: 17406)
70 Linden Oaks, Suite 210
Rochester, NY 14625
Tel.: (585) 270-2102
Email: Andrew.Zappia@troutman.com

Of counsel:
Bryan C. Smith, Esquire (*pro hac* vice to be filed)
**TROUTMAN PEPPER LOCKE LLP**
70 Linden Oaks, Suite 210
Rochester, NY 14625
Tel.: (585) 270-2141
Email: Bryan.Smith@troutman.com
Attorneys for Plaintiff Urban One, Inc.

/s/ Samuel Q. Elira Sr._____
Samuel Q. Elira Sr., Esquire