**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **URBAN ONE, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**MICK UNPLUGGED, LLC and MICK D. HUNT, JR.,**<br><br>Defendants. | Case No.: 8:25-cv-02850-LKG |

## MOTION TO DISMISS AMENDED COMPLAINT

The defendants, Mick Unplugged, LLC, et al., by and through undersigned counsel, Samuel Q. Elira Sr. and THE ELIRA LAW FIRM, LLC., pursuant to Fed.R.Civ.P. 12(b)(b)(6) hereby move this Court to dismiss the plaintiff's Amended Complaint in its entirely with prejudice as the plaintiff has again failed to state a claim upon which relief can be granted. In support thereof, the defendants state the following:

## FACTS

1. The plaintiff filed a Complaint against the defendants, Mick Unplugged, LLC and Mick D. Hunt, Jr. In the Complaint, the plaintiff made five specific claims for Breach of Contract, Pro-Rated Damages for Breach of Contract, Implied Covenant of Good Faith and Fair Dealing, Unjust Enrichment, and Fraudulent Inducement.

2. The defendants filed a Motion to Dismiss the Complaint for failing to state a claim upon which this court may grant any relief. While challenging the

defendants' motion, the plaintiff has filed an Amended Complaint, tried to address issues raised in the Motion to Dismiss, and added a new claim to the Complaint.

**DISCUSSION**

**Standard for Motion to Dismiss**

3. "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). When ruling on a 12(b)(6) motion, the court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's factual allegations, as well as all reasonable inferences therefrom, as true. See Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); Martin, 980 F.2d at 952; Westray v. Porthole, Inc., 586 F.Supp. 834, 836 (D. Md. 1984). Nevertheless, a motion to dismiss under Rule 12(b)(6) may be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989). In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. Randall v. United States, 30 F.3d 518, 522 (4th Cir.1994); Labram v. Havel, 43 F.3d 918, 921 (4th Cir. 1995) (affirming Rule 12(b)(6) dismissal with prejudice because plaintiff's alleged facts failed to support her conclusion that the defendant owed her a fiduciary duty at common law); Faulkner Advertising. v. Nissan Motor Corp., 945 F.2d 694, 695 (4th Cir. 1991) ("[S]elf-serving, inaccurate legal conclusions cannot rescue a

factually deficient complaint"). For reasons stated in each section, the Court must as a matter of law dismiss the plaintiff's Amended Complaint in its entirety.

**Piercing the Corporate Veil**

4. One of the major issues raised in the Amended Complaint is to pierce the corporate veil of defendant Mick Unplugged, LLC, to reach the individual Mr. Mick Hunt, Jr. To raise this new issue the plaintiff alleged that Mr. Hunt utilized Mick Unplugged as "a mere instrumentality in disregard of corporate formalities to conduct his own personal business and to perpetrate and shield himself from liability for improper conduct, including evading legal obligations and fraudulent conduct."

5. In support his broad claim, the plaintiff alleged that "Mick Unplugged was incorporated by Hunt through Articles of Organization filed with the North Carolina Secretary of State on December 22, 2023." The Articles of Organization listed Mr. Hunt and one Marcey Bothe as the members of Mick Unplugged. The plaintiff alleged that "[u]pon information and belief, Marcey Bothe is Hunt's spouse."

6. According to the plaintiff and "[u]pon information and belief, Hunt served as the Chief Executive Officer of Mick Unplugged and "totally controlled and dominated Mick Unplugged and directed its activities for his own personal benefit with disregard of corporate formalities." In support, the plaintiff cited that Mick Unplugged's "Articles of Organization list the principal office of Mick Unplugged as 925 Sweet Olive Ct, Wake Forest, North Carolina 27587."

7. However, in the agreement between the plaintiff and Mick Unplugged, LLC, entered into on August 27, 2024 and amended on March 28, 2025, Mick Unplugged listed its address as "350 Carriage Hill Drive, Easley, South Carolina

29642." Nevertheless, "[u]pon information and belief," this South Carolina address is Mr. Hunt's personal residence, and Mick Unplugged did not file a change of address with the North Carolina Secretary of State.

8. The plaintiff concluded that "upon information and belief, Hunt maintained no office for Mick Unplugged separate from his personal residence." The plaintiff further concluded that Mr. Hunt "considered his personal address as the location of that entity when he registered a different address with the North Carolina Secretary of State."

9. Two months after the partied entered into their Amended Agreement, "On May 27, 2025, the North Carolina Secretary of State issued a Certificate of Administrative Dissolution to Mick Unplugged . . . for failure to comply with corporate formalities, i.e., failing to file an annual report." The plaintiff added that "Defendants never advised Urban One of the dissolutions of Mick Unplugged. Thus, "[d]espite Hunt using Mick Unplugged as an operating entity and a contracting entity with Urban One, Hunt failed to maintain that entity. Hunt did not maintain the existence and solvency of that entity, there was a clear absence of required corporate records and filings, and thus Hunt disregarded corporate formalities."

10. Furthermore, "[d]espite Hunt failing to maintain Mick Unplugged and the issuance of the Dissolution Certificate, Hunt continued in his personal capacity to act as though Mick Unplugged was still an extant entity and to operate as Mick Unplugged for his own personal business, as described in further detail below. Thus, Hunt has not respected or maintained corporate formalities and has used Mick Unplugged, which he allowed to be dissolved, as a mere instrumentality to pursue his

personal activities despite that entity's dissolution." The plaintiff added that "Hunt, through Mick Unplugged, entered into an agreement with Urban One and an amendment to that agreement. However, after Hunt allowed Mick Unplugged to be dissolved, he continued in his personal capacity to purport to take actions on behalf of the dissolved Mick Unplugged entity under those agreements. For example, Hunt delivered podcast episodes under those agreements after Hunt allowed Mick Unplugged to be dissolved and without ever giving notice to Urban One of that dissolution."

11. According to the plaintiff, "Despite allowing Mick Unplugged to be dissolved, Hunt in his personal capacity is still acting through that now defunct entity. For example, Hunt advertises "Mick Unplugged" as that entity's podcast on his website." In fact, "upon information and belief, on or about July 23, 2025, Hunt entered into a partnership with Realm, again under the "Mick Unplugged" entity moniker."

12. In conclusion, according to the plaintiff, "upon information and belief, Mick Unplugged does not have any separate and distinct existence from Hunt." The plaintiff further concluded that "upon information and belief, Hunt allowed Mick Unplugged to be dissolved as part of his scheme to evade his legal and contractual obligations, to breach and repudiate the agreements at issue, and to attempt to deny Urban One any effective remedies against his improper and fraudulent conduct." In fact, [a]s detailed below, Defendants have engaged in fraudulent activity as defined in the parties' agreements and under common law, have breached Urban One's exclusivity rights under the agreements at issue, and have undermined and injured

Urban's One's rights, interests, and revenue streams under those agreements. This improper conduct has caused significant injuries to Urban One. Hunt is attempting to use Mick Unplugged and its dissolution to evade liability for this conduct."

13. The plaintiff further asserted that "Hunt used and is using Mick Unplugged and its dissolution to evade legal and contractual obligations, to perpetuate a fraud, to shield his improper conduct, and to attempt to insulate himself from liability for his improper and fraudulent conduct." According to the plaintiff, in light of the above allegations, "corporate veil piercing is warranted here, and Hunt has personal liability for the causes of action set forth below."

14. MD Corporations and Associations Code § 4A-301 provides that "[e]xcept as otherwise provided by this title, no member shall be personally liable for the obligations of the limited liability company, whether arising in contract, tort or otherwise, solely by reason of being a member of the limited liability company."

15. In Bart Arconti & Sons v. Ames-Ennis, 275 Md. 295, 310 (1975), after reviewing pronouncements in earlier cases and the then-accepted treatise on Maryland corporation law, the Court stated that "[a]lthough a number of variations upon the same theme may be found, the most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist ... shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity." See also Hildreth v. Tidewater Equipment Co., 378 Md. 724 (2003).

16. Despite this pronouncement, this standard has been so narrowly construed that neither the Supreme Court nor the Appellate Court has ever "found an equitable interest more important than the state's interest in limited shareholder liability." See Residential Warranty v. Bancroft Homes Greenspring Valley, Inc., 126 Md.App. 294, 307 n. 13 (1999) (quoting G. Michael Epperson & Joan M. Canny, The Capital Shareholder's Ultimate Calamity: Pierced Corporate Veils and Shareholder Liability in the District of Columbia, Maryland, and Virginia, 37 Cath. U.L.Rev. 605, 621 (1988)). See also id. at 309 ("Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil."). See also McCleary v. McCleary, 150 Md.App. 448, 458 (2002), (Maryland recognized the availability of an action to disregard a limited liability entity "congruent with the equitable remedy of piercing the corporate veil," where the Appellate Court reversed the circuit court for improperly 'pierc[ing] the LLC's veil of limited liability' and classifying an entity's asset as a marital asset of the sole member for the purposes of determining a marital property award based upon the appellant's sole membership interest in the LLC).

17. In Stein v. Smith, 358 Md. 670 (Md. 2000), the Court would reiterate this principle that the "corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity," citing Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., 275 Md. 295, 312, (1975). See also Ferguson Trenching Co. v. Kiehne, 329 Md. 169, 175, (1993); Starfish Condominium Ass'n v. Yorkridge Serv. Corp., 295 Md. 693, 714, (1983); Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc., 126 Md.App. 294, 306-07, cert. denied, 355 Md. 613 (1999). Despite repeated recitation of "paramount equity," the Supreme Court has

never sustained a finding of paramount equity in Maryland. This leaves the plaintiff with fraud as the only basis to pierce the Mick Unplugged's corporate veil.

ALTER EGO THEORY

18. The plaintiff stated that "Hunt is personally liable for this conduct, including because Hunt was and is the alter ego of Mick Unplugged and is liable for the breaches of contract by Mick Unplugged." While the plaintiff did not plead how the alter ego theory applies in this instance, in Hildreth v. Tidewater Equipment Co., 838 A.2d 1204, 378 Md. 724 (Md. 2003), the Court discussed the alter ego theory for piercing the corporate veil in Maryland and stated that in "a number of cases, including Bart Arconti, we made favorable reference to the synthesis supplied in the 1953 edition of Herbert Brune's work, MARYLAND CORPORATION LAW AND PRACTICE, § 371, as to when a corporate entity will be disregarded:

> First. Where the corporation is used as a mere shield for the perpetration of a fraud, the courts will disregard the fiction of separate corporate entity.
>
> Second. The courts may consider a corporation as unencumbered by the fiction of corporate entity and deal with substance rather than form as though the corporation did not exist, in order to prevent evasion of legal obligations.
>
> Third. Where the stockholders themselves, or a parent corporation owning the stock of a subsidiary corporation, fail to observe the corporate entity, operating the business or dealing with the corporation's property as if it were their own, the courts will also disregard the corporate entity for the protection of third persons.

(Emphasis added). After ruling out the first and second circumstances, the Court stated that:

> The third circumstance embodies what is sometimes called the 'alter ego' doctrine. Fletcher observes that the 'alter ego' doctrine has been

> applied 'where the corporate entity has been used as a subterfuge and to observe it would work an injustice,' the rationale being that 'if the shareholders or the corporations themselves disregard the proper formalities of a corporation, then the law will do likewise as necessary to protect individual and corporate creditors.' 1 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41.10 at 574-76 (1999 Rev. Vol.). The doctrine, says Fletcher, is applied 'with great caution and reluctance' and only in 'exceptional circumstances.' Id. at 579-80. Courts will apply the doctrine when the plaintiff shows (1) 'complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own,' (2) that 'such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights,' and (3) that such 'control and breach of duty proximately caused the injury or unjust loss.' Id. at 583-86. Because piercing the corporate veil is founded on equity, 'where no fraud is shown, the plaintiff must show that an inequitable result, involving fundamental unfairness, will result from a failure to disregard the corporate form.' Id. at 605.

Hildreth v. Tidewater Equipment Co., 838 A.2d 1204, 378 Md. 724 (Md. 2003). There is nothing in the Amended Complaint to demonstrate that "such control was used by Mr. Hunt to commit fraud or a wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights. More importantly, the "control and breach of duty did not cause "the injury or unjust loss" of which the plaintiff complains. The corporate form or failure to file appropriate documents with the State of North Carolina have nothing to do with the contract dispute between the parties.

19. One reason commentators have suggested that the alter ego theory should be applied 'with great caution and reluctance' and only in 'exceptional circumstances is this:

> the formalities factor should yield different results depending upon whether the action is in contract or tort. In contract actions, the corporate entity should not be disregarded regardless of any abuse of formalities. This position . . . is premised on the notion that when a third party enters into a contract with a corporation or a corporate owner, he does so voluntarily and at his own risk. Therefore, in contractual situations where an abuse of formalities is present, the third party has the ability to determine whether the corporate entity is separate from its owner, and accordingly should have determined with whom he dealt.

(Citations omitted). Speer, Denise L. (1985) "Comment: "Piercing the Corporate Veil" in Maryland: An Analysis and Suggested Approach," University of Baltimore Law Review: Vol. 14: Iss. 2, Article 4 (citations omitted).

20. This reasoning applies to the plaintiff. The plaintiff dealt with Mick Unplugged from August 2024 until May 2025. One month after the administrative dissolution of Mick Unplugged, the plaintiff determined that the corporate exercised of mick Unplugged was not separate from Mick Unplugged and exercised its right to terminate the Agreement. Further, as a sophisticated nationwide media outlet, the plaintiff approached Mick Unplugged, LLC, having done its due investigation or due diligence regarding Mick Unplugged, LLC. The plaintiff knew that Mick Unplugged was a limited liability company with a single shareholder. The plaintiff went entered into the Initial Agreement with Mick Unplugged. When Mick Unplugged expressed dissatisfaction with the Initial Agreement, the plaintiff amended the Agreement to satisfy Mick Unplugged and to extend the period of the contract. Two months after the

amendment, when the state of North Carolina issued an administrative dissolution of the company, the plaintiff realize that Mick Unplugged's corporate formality presented a business risk and sought to disregard its corporate formalities.

21. More importantly, the timing of the specific actions by Mick Unplugged, the plaintiff, and the state of North Carolina is instructive. According to the plaintiff, Mick Unplugged filed Articles of Organization filed with the North Carolina Secretary of State on December 22, 2023. Eight months later, on August 27 2024, the plaintiff entered into the Initial Agreement with Mick Unplugged, then in apparent and full compliance with all state corporate formalities. Seven month later or seven months after doing business with Mick Unplugged, LLC, the plaintiff and Mick Unplugged, LLC, amended their Agreement on March 28, 2025. At the time of this amendment, Mick Unplugged, LLC, was still in apparent compliance with all North Carolina corporate formalities. In fact, the plaintiff, in the Amended Agreement, extended its contract with Mick Unplugged. Two months later, on May 27, 2025, the North Carolina Secretary of State issued a Certificate of Administrative Dissolution to Mick Unplugged ("Dissolution Certificate"), for failure to comply with corporate formalities, *i.e.*, failing to file an annual report." One month later, on or about June 23, 2025, the plaintiff "sent a letter to Defendants to exercise its right to notice termination of the Agreements."

22. For most of their contract or agreement period, Mick Unplugged, LLC, was a fully functional corporate entity, and the plaintiff dealt with the company as such. The plaintiff only dealt with Mick Unplugged for one month after the administrative dissolution. Now, the plaintiff, who knowingly entered into a contract

with a single-share holder company and did business with it for nine months, (between August 2024 and May 2025) seeks the court's intervention to pierce the corporate veil of this company because of an administrative dissolution after having dealt with the company for most the period of the contract.

**COUNT I**
**BREACH OF CONTRACT**

23. After stating that the Agreements were binding on the parties and that the plaintiff had performed its obligations under the Agreements, the plaintiff concluded that the Agreement expressly prohibited the defendants from artificially and/or fraudulently manipulating download and audience engagement data for the Podcast. The plaintiff then proceeded to restate 1) the various ways it believed the defendants breached their contract with the plaintiff; and 2) that the Agreements included an implied covenant of good faith and fair dealing. The plaintiff alleged that Mick Unplugged breached their Agreement in the following ways.

I. Defendants breached the Podcast License Agreement by, among other things, manipulation of the number of downloads and other audience engagement metrics for the Podcast, for example, by hiring Audience Lift to artificially inflate the number of downloads.

II. Further, as set forth above, the Podcast License Agreement provided Urban One with exclusive rights to distribute the Podcast.

III. Defendants breached Urban One's exclusive rights under the Podcast License Agreement, for example, by engaging a third party to market the Podcast, by removing Urban One's branding from the Podcast, re-branding the Podcast with the "Unplugged Studios" moniker, and distributing the Podcast through another platform.

IV. Additionally, the Podcast License Agreement, including without limitation, Section 11, prohibited Defendants from entering into any agreements that would prevent the fulfillment of the agreement or impair or diminish the value of the rights granted thereunder.

V. Defendants breached this warranty not to impair the value of rights granted to Urban One in the Podcast License Agreement based on their violations of Urban One's exclusive distribution rights, as discussed above.

VI. The Podcast License Agreement further provided that other than the revenue share set forth therein, all other revenue streams belonged to Urban One.

VII. Defendants breached the revenue stream provision of the Podcast License Agreement based on their violations of Urban One's exclusive distribution rights, as discussed above.

VIII. Defendants also anticipatorily breached the Podcast License Agreement by refusing to perform under that agreement, i.e., refusing to provide additional episodes of the Podcast, without the receipt of additional compensation not contemplated under the Podcast License Agreement.

IX. Defendants also breached the Podcast License Agreement by allowing Mick Unplugged to be dissolved.

25. The plaintiff alleges that it is seeking all damages available under the applicable law for breach of contract, including compensatory damages. But the plaintiff also alleges that it is not seeking pro-rated damages for breach of contract. Whether the plaintiff is seeking compensatory or not pro-rated damages for breach of contract is relevant. What is controlling between the plaintiff and Mick Unplugged, LLC, are the terms of their contract.

Liquidated Damages

26. Section 14 of the Agreement provides in part that "[i]f Company terminates this Agreement with respect to the Licensed Rights due to a default by Licensor, Licensor shall refund to Company the pro-rated amount of this Agreement based on the number of months remaining in the License Period." This pro-rated provision of the Agreement is a liquidated damages provision. In Massachusetts

Indem. & Life Ins. Co. v. Dresser, the Maryland Supreme Court stated the test for the validity of an enforceable liquidated damages clause:

> (1) clear and unambiguous language providing for 'a certain sum';
> (2) stipulated damages that represent reasonable compensation for the damages anticipated from the breach, measured prospectively at the time of the contract rather than in hindsight at the time of the breach; and
> (3) a "mandatory binding agreement[] before the fact which may not be altered to correspond to actual damages determined after the fact."

269 Md. 364, 368-69 (1973).

27. In 8621 Limited Partnership v. LDG, Inc., 169 Md.App. 214 (2006), the Appellate Court of Maryland considered ambiguity in contract terms and reasoned that "the primary source for determining the intention of the parties is the language of the contract itself." Citing Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship, 109 Md.App. 217, 290-91, aff'd, 346 Md. 122 (1997). The Court continued that "[c]ontracts are interpreted objectively, which "means that the clear and unambiguous language of a written agreement controls[.]" Quoting First Union Nat'l Bank v. Steele Software Sys. Corp., 154 Md.App. 97, 171 (2003), cert. denied, 380 Md. 619 (2004). Language in a contract is considered "ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person." Maslow v. Vanguri, 168 Md.App. 298, 318 (2006). "To determine whether a contract is susceptible of more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.'" Id.

28. Nevertheless, "'[a] court cannot enforce a contract unless it can determine what it is.'" See First Nat'l Bank v. Burton, Parsons & Co., 57 Md.App.

437, 450, cert. denied, 300 Md. 88 (1984) (quoting 1 Corbin on Contracts § 95). "An agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable." Maslow, 168 Md.App. at 322. Therefore, the parties to a contract "must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract." First Nat'l Bank, 57 Md.App. at 450 (quoting Corbin, supra ).

29. Maryland courts have therefore consistently held that a contract is not enforceable unless it expresses with definiteness and certainty the nature and extent of the parties' obligations and the essential terms of the agreement. Mogavero v. Silverstein, 142 Md.App. 259, 272 (2002), cert. denied, 369 Md. 181 (2002); Canaras v. Lift Truck Services, 272 Md. 337, 346 (1974); Meyers v. Josselyn, 212 Md. 266, 271 (1957); Robinson v. Gardiner, 196 Md. 213, 217 (1950). In other words, an agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable. Mogavero, 142 Md.App. at 272 ; L L Corp. v. Ammendale, 248 Md. 380, 385 (1968); Schloss v. Davis, 213 Md. 119, 123 (1957) (a "contract may be so vague and uncertain as to price or amount as to be unenforceable."). In Robinson, 196 Md. at 217, the Court addressed the requirement of contractual certainty, stating:

> Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The

> parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties. See also Joseph M. Perillo, 1 Corbin on Contracts § 4.1, at 525 (Rev. ed. 1993) ("Corbin") ("Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract."); Restatement, § 33(1), at 92 ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain").

30. The "amount" in the "pro-rated amount of this Agreement" is not defined anywhere in either the Initial or Amended Agreement. The term is vague and indefinite, and the plaintiff recognized that fact. The plaintiff, therefore, sought to fill in this gap, to cure this vagueness. The plaintiff has interpreted the term "amount" to mean "average monthly net proceeds." As the plaintiff calculated, this "average monthly net proceeds" will net the plaintiff "not . . . less than $1.9 million." But there is no basis in the Initial or Amended Agreement for this interpretation other than the plaintiff's interpretation.

31. The word "amount" in this context is vague, indefinite, and uncertain. This uncertainly would require this Court or a jury to rewrite the contract for the parties, giving to one party a benefit for which they did not bargain and delivering to other party a detriment they did not intend. Furthermore, given this ambiguity, this vague term "amount," as used in this context, should to be construed against the

maker, the plaintiff. See Empire Fire and Marine Ins. Co. v. Liberty Mut. Ins. Co., 117 Md.App. 72 (1996).

32. Given this ambiguity, damages, an essential element of any contract, the Amended Agreement is unenforceable. Its language is not sufficiently definite to clearly inform Mick Unplugged that it may be called upon to pay $1.9m to the plaintiff. The language must also be sufficiently clear and definite in order that this Court may be able to know the purpose and intention of the parties. "Vagueness of expression, indefiniteness and uncertainty" as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract because even though an offer was intended, its acceptance cannot be said to be clear so as to form a contract.

Implied Covenant of Good Faith and Fair Dealing

33. In the Complaint, the plaintiff pleaded the Implied Covenant of Good Faith and Fair Dealing as a stand alone claim. However, in its Amended Complaint, after alleging the various ways the defendants breached their Agreements, the plaintiff simply pleaded as follows:

> In addition to and/or as a pleading in the alternative, Defendants have also breached the implied covenant of good faith and fair dealing through fraudulent and improper activity, including manipulation of the number of downloads and other audience engagement metrics for the Podcast, as well as violating Urban One's exclusive rights to distribute the Podcast and by allowing Mick Unplugged to be dissolved. Regarding these actions, even if it is alleged that some of them were not expressly barred by the Agreements, Defendants' improper conduct was designed to deny Urban One the benefits it bargained for under the Agreements.
>
> Defendants' actions have been taken in a bad faith effort to intentionally deny Urban One the benefits of its bargain under the Agreements.

The plaintiff concluded that "[a]s a result of Defendants' breach of the implied covenant of good faith and fair dealing, Urban One has suffered and will continue to suffer direct and consequential damages, including, but not limited to, the loss of revenue derived from the Podcast, and Urban One's reasonable attorneys' fees incurred in connection with this suit. The plaintiff further concluded that "[a]s a result of Defendants' breaches, including express breaches of contract and/or breaches of the implied covenant of good faith and faith dealing, Urban One is entitled to all damages available under applicable law for breach of contract, including without limitation, compensatory damages. Urban One has been damaged by Defendants in an amount to be determined at trial. Urban One is not seeking pro-rated damages in this Count I."

34. In every contract, whether made explicit or not, there is an implied duty of good faith and fair dealing which imposes upon the parties to the contract an obligation that they not "act[ ] in such a manner as to prevent the other party from performing his obligations under the contract." Parker v. Columbia Bank, 91 Md.App. 346, 366 (1992). Emphasis added. But the implied covenant of good faith and fair dealing does not, in and of itself, support a cause of action for breach of contract. As the Appellate Court of Maryland explained in Mount Vernon Properties, LLC v. Branch Banking And Trust Co.:

> [T]here is no independent cause of action at law in Maryland for breach of the implied covenant of good faith and fair dealing. Although the issue has not been specifically addressed by the Maryland appellate courts, we agree with the circuit court that no such action at law exists in Maryland.

170 Md.App. 457, 471-72 (2007). The court would also find as "persuasive the reasoning of the United States District Court in Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc., 190 F.Supp. 2d 785, 794 (D. Md. 2002), that "[t]he implied duty of good faith 'prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.'" Citing Parker v. The Columbia Bank, 91 Md.App. 346, 366, cert. denied, 327 Md. 524 (1992). One court in fact reasoned that since the Appellate Court of Maryland "did not go further [in the Parker case] and rule that there is a duty requiring affirmative steps beyond those required by the contract itself. Therefore, this duty is merely part of an action for breach of contract, Howard Oaks, Inc. v. Maryland Nat'l Bank, 810 F.Supp. 674 (D.Md.1993), and so, because [one count] already states a claim for breach of contract, [the count purporting to state a claim for breach of the implied duty of good faith] does not state a different claim and will be dismissed." Id. Emphasis added. See also Baker v. Sun Co., 985 F.Supp. 609, 610 (D. Md. 1997) ("Maryland does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing."); PAUL MARK SANDLER & JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND, § 2.1 at 29 (3d ed. 2004) ("Maryland does not recognize . . . an independent cause of action for breach of the implied contractual duty of good faith and fair dealing."). A breach of the implied duty of good faith and fair dealing is better viewed as an element of another cause of action at law, e.g., breach of contract, than as a stand-alone cause of action for money damages, and the court concluded that no

independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing.

35. Again, while the plaintiff now seems to appreciate that the Agreements included an implied duty of good faith and fair dealing, the plaintiff still proceeded to specifically plead what appears to be a completely independent cause of action, complete with damages and attorney's fees for what it believes to be a separate cause of action. To be clear, the plaintiff's allegations continue to relate solely to facts already raised under Count I for breach of contract. Since the implied duty of good faith and fair dealing is not an independent cause of action in Maryland, the Court cannot grant any reliefs based on a non-existent cause of action.

**COUNT II**
**PRO-RATED DAMAGES FOR BREACH OF CONTRACT**

36. The plaintiff alleged that having performed its obligation under the Agreement and Mick Unplugged breached its obligations under the Agreement, it had the right to terminate the Agreements. Specifically, Section 14 of the Agreement provides, in relevant part that:

> If Company terminates this Agreement with respect to the Licensed Rights due to a default by Licensor, Licensor shall refund to Company the pro-rated amount of this Agreement based on the number of months remaining in the License Period within seven (7) days of such termination, and Company shall have no further obligations to Licensor.

"Since the effective date of the Podcast License Agreement, Urban One's average monthly net proceeds under the Podcast License Agreement were approximately $35,197.11 . . . . . Thus, as of the termination date, fifty-four (54) months remained in the License Period. As a result, under Section 14 (as expressly and specifically

defined in the terms of the Podcast License Agreement), Defendants were obligated to pay Urban One $1,900,643.94 (54 x $35,197.11), within seven (7) days of the date of the termination notice, in view of Defendants' obligation to 'refund to [Urban One] the pro-rated amount of this Agreement based on the number of months remaining in the License Period within seven (7) days of such termination.'" The plaintiff seeks "Pro-rated damages . . . only in Count II of this Amended Complaint."

37. For Count II, labeled "Pro-Rated Damages for Breach of Contract," the plaintiff makes no specific factual allegations. The plaintiff merely repeated allegations previously made in the general and narrative section of the Amended Complaint and under Count I of the Amended Complaint.

38. Courts have repeatedly held that a remedy or claim for relief is not a cause of action. In Fare Deals Ltd. v. World Choice Travel. Com, Inc., 180 F.Supp. 2d 678 (D. Md. 2001), the court held that "a request for injunctive relief does not constitute an independent cause of action; rather, the injunction is merely the remedy sought for the legal wrongs alleged in the nine substantive counts." Citing Howell Petroleum Corp. v. Leben Oil Corp., 976 F.2d 614, 622 (10th Cir.1992) (Similarly, "[a] request for damages ... does not constitute a cause of action; rather damages are a remedy for a legal wrong.") Citing Thomas v. Casford, 363 P.2d 856, 858 (Okla.1961). Other jurisdictions have similarly held that a request for an injunction or for damages is not a cause of action but a remedy to a cause of action. In Long v. Dell, Inc., No. 12-248-Appeal at 23-24, the Rhode Island Supreme Court clarified that "[a]n injunction is a remedy, not a cause of action." (Upholding the trial court's dismissal of the plaintiff's request for injunctive relief). In so holding, the court recognized

authority from other jurisdictions which similarly hold that injunctive relief is not a cause of action. See Thompson v. JP Morgan Chase Bank, N.A., No. 13-2230, 2014 WL 1586992, at *1 n.1 (6th Cir. Apr. 22, 2014); Koufos v. U.S. Bank, N.A., 939 F.Supp. 2d 40, 46 (D. Mass. 2013)). Without more, the Court must dismiss Counts II of the plaintiff's Complaint for failing to state a claim for which any relief may be granted.

39. The defendants addressed the plaintiff's claim for damages. Damages is an essential element of any enforceable contract. Plaintiff's claim for damages is the pro-rata provision provided in Section 14 of the Agreement. The pro-rata provision in the Agreement is a liquidated damages provision. The liquidated damages provision is unenforceable as it is vague. The plaintiff also seeks disgorgement, an equitable remedy. The plaintiff has a remedy at law, as provided in its Agreement. Plaintiff has not pleaded how it would be entitled to a remedy in equity when it has an express remedy at law.

## COUNT III
## UNJUST ENRICHMENT

40. According to the plaintiff, "[b]y virtue of the revenue share payments made by Urban One to Defendants pursuant to the Agreements, Urban One conferred a benefit upon Defendants." This benefit, the revenue share percentage, was based on "the improper and fraudulently manipulated download and audience engagement metrics for the Podcast." In addition, "Defendants distributed the Podcast on a platform not operated by Urban One in violation of Urban One's exclusive rights and in a fraudulent and bad faith manner." As for damages for unjust enrichment, the amount will be provided at trial, the plaintiff alleged.

41. A contract implied in law, also known as a quasi-contract or a constructive contract, is an obligation created by law for the sake of justice or to avoid unjust enrichment. A contract implied in law operates as a valid contract for purposes of remedy only. The general rules of contract do not apply to contracts implied in law. A court cannot find a contract implied in law if there already exists a contract, either express or implied, covering the same subject matter.

42. In Maryland, a party cannot be successful in an unjust enrichment lawsuit where that party is also claiming the existence of a contract or agreement. In FLF, INC. v. World Publications, Inc., 999 F.Supp. 640 (D. Md. 1998), the court reasoned that the defendant, FLF, "plainly cannot maintain a claim for unjust enrichment." The court held that "[i]t is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties," citing MTA v. Granite Const. Co., 57 Md.App. 766, 776 (1984); First Nat'l Bank v. Burton, Parsons & Co., 57 Md.App. 437, 451 (1984), cert. denied. 300 Md. 90 (1984); see Attorney Grievance Commission v. McIntire, 286 Md. 87, 93 (1979) ("once a contract ... is formed, its terms are to be followed"). The court reasoned that unjust enrichment is a method for a party that conferred a benefit without having a contract or agreement to be made whole. A party that clearly received a benefit (whether money, items, or services) with the knowledge of that benefit being conferred should not be able to receive a windfall of those benefits simply because no contract was agreed-to. The court held that "[g]iven the express contract between the parties here specifically providing that WPI

would not be liable for severance payments, FLF's claim that WPI has been ‘unjustly’ enriched because it has not made those same payments is clearly without basis.”

43. In this instance, there is no dispute that the parties entered into a contract. The plaintiff has supplied a copy of the Agreements. The plaintiff has also cited and quoted copiously to the Agreements. To rely on the express Agreements for remedy and to also rely on another theory for the same recovery is clearly without basis.

Disgorgement of Profits

44. The Supreme Court “has recognized that damages which are ‘restitutionary,’ e.g., ‘disgorgement of improper profits’ or ‘incidental to or intertwined with’ certain equitable relief, e.g., an injunction, are equitable.’” Chauffeurs Local 391 v. Terry, 494 U.S. 558 (1990). See also Fink v. Pohlman, 85 Md.App. 106, 122 (1990). Mattingly v. Mattingly, 92 Md.App. 248 (1991). The Court of Appeals has held that the disgorgement of profits is appropriate in instances of unjust enrichment. See e.g., Morgan, 387 Md. at 169. The disgorgement of profits is a permissible consideration in determining restitution for unjust enrichment. See Morgan, 387 Md. at 169. The disgorgement of profits is an appropriate consideration in calculating restitution under the theory of unjust enrichment. Mogavero, 142 Md. App. at 276 (explaining that our focus is on what the defendant gained).

45. In Maryland, a party cannot be successful in an unjust enrichment lawsuit where that party is also claiming the existence of a contract or agreement. In FLF, INC. v. World Publications, Inc., 999 F.Supp. 640 (D. Md. 1998). If the defendant cannot maintain an action for unjust while it is also claiming the existence

of a contract at law, the plaintiff may not seek relief equitable remedy only available to actions in equity. Disgorgement is an equitable remedy and is only available as relief for unjust enrichment. In fact, "[r]estitution involves the disgorgement of unjust enrichment.' Consumer Protection Div. v. Morgan, 387 Md. 125, 168, 874 A.2d 919 (2005)." Bank of America Corp. v. Gibbons, 918 A.2d 565, 173 Md. App. 261 (Md. App. 2007). Hence, the defendant's claim for relief of disgorgement is unfounded.

**COUNT IV**
**FRAUDULENT INDUCEMENT**

46. For this claim, the plaintiff alleged "Defendants fraudulently manipulated the number of downloads of the Podcast in order to falsely represent high audience engagement and to manufacture a high national ranking for the Podcast in terms of audience engagement, visibility, and success. Defendants did this with the intent to mislead Urban One and to induce Urban One to enter into the Agreements." Also, "Defendants made misrepresentations regarding the downloads being organic, not manipulated, and being authentic, and made misrepresentations regarding the level of audience engagement with the Podcast, with the intention and expectation that Urban One would rely on those representations during the negotiation of the Amendment and to induce Urban One to enter into the Amendment."

47. The plaintiff "justifiably relied on Defendants' misrepresentations in increasing the revenue share to Defendants under the Podcast License Agreement." But "the downloads and audience engagement metrics were intentionally and artificially manipulated by Defendants, with the intent to induce Urban One to enter into the Agreements and to rely on that data to grant a high level of compensation and benefits to Defendants under the Agreements." The plaintiff also alleged that under

"Section 6.3 of the Podcast License Agreement that such manipulation of download and audience engagement and success metric data would be 'Fraudulent Activity.'"

48. According to the plaintiff, it was induced into entering into the Agreement, the Amended Agreement, increasing Mick Unplug's revenue share, and extended the length or duration of the Agreement. In fact, "upon information and belief, Defendants fraudulently manipulated download, audience engagement, and success metrics for the Podcast in the same manner as alleged above, prior to the execution of the Podcast License Agreement, to induce Urban One to enter into the Podcast License Agreement." In fact, the plaintiff "justifiably relied on that download, audience engagement, and success metric data when it originally entered into the Podcast License Agreement and granted Defendants the compensation set forth therein." "By their improper and fraudulent conduct, Defendants fraudulently induced" the plaintiff into the initial Agreement. Based on these, the plaintiff, in addition to seeking pro-rata damages, seeks the equitable remedy of "disgorgement of the payments made to Defendants, Urban One's damages and costs/attorneys' fees, and punitive damages based on Defendants' fraudulent activities."

49. In Dynacorp Ltd. v. Aramtel Ltd., this Court listed the five elements of fraudulent inducement, stating: To entitle the plaintiff to recover it must be shown by clear and convincing evidence: (1) that the representation made is false; (2) that its falsity was either known to the defendant, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the plaintiff; (4) that the plaintiff not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its

truth, and that the plaintiff would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that the plaintiff actually suffered damage directly resulting from such fraudulent misrepresentation. Dynacorp Ltd. v. Aramtel Ltd., 208 Md.App. 403, 452 (2012) (quoting First Union Nat'l Bank v. Steele Software Sys., 154 Md.App. 97, 134 (2003)).

50. The Court of Appeals has described fraud in the inducement as "a term used to describe a situation where a person is induced by some fraudulent representation or pretense to execute the very instrument which is intended to be executed." Meyers v. Murphy, 181 Md. 98, 100 (1942). Specifically, the Court in Meyers explained as follows:

> No question arises in the case as to the rights of third parties, so that it becomes unnecessary to consider whether the fraud claimed is fraud in the factum or fraud in the treaty. Fraud in the factum is said to arise from the want of identity or disparity between the instrument executed and the one intended to be executed, or from circumstances which go to the question whether the instrument in fact ever had any legal existence. Fraud in the treaty is a term used to describe a situation where a person is induced by some fraudulent representation or pretense to execute the very instrument which is intended to be executed, for example, where a person who can read neglects to read a paper because of some false representation and signs it with a misapprehension as to the contents. The difference between the two kinds of fraud becomes important only in relation to third parties, because fraud in the factum makes the instrument absolutely void, whereas fraud in the treaty renders it voidable and brings into play the equitable principle that where one of two innocent parties suffer from the act of the third, he who has enabled such third person to occasion the loss must sustain it.

Meyers v. Murphy, 181 Md. 98, 99-100 (Md. 1942). The Appellate Court further explained that, "[t]he tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment." Rozen v. Greenberg, 165 Md.App. 665, 674 (2005) (citing Sec. Constr.

Co. v. Maietta, 25 Md.App. 303, 307 (1975)). As to fraudulent inducement, in Goldstein v. Miles, 159 Md.App. 403, 437, 859 A.2d 313 (2004), cert. denied, 384 Md. 581 (2005), this Court held that the plaintiffs "failed to produce sufficient evidence that they reasonably relied upon [the defendant]'s representations" because the defendant's "statements were too indefinite, vague, and general to be considered as anything more than expressions of expectation or probability and therefore [were] not actionable as fraudulent misrepresentations."

51. More recently addressed, Swinton involved a home health care services provider's lawsuit against Lillian and Mary Tayman to recover amounts allegedly owed for services rendered to Mary pursuant to a signed agreement. Swinton Home Care, LLC v. Tayman, 264 Md.App. 487 (2025). In her defense, Lillian claimed that there were no valid agreements between the parties because she was fraudulently induced to sign a services agreement for in-home health care and nursing services and a guaranty agreement. During the trial, Lillian testified that prior to signing the agreement, she told the plaintiff's representative that she did not have power of attorney over Mary. She added that the plaintiff's representative told her she could sign the agreement in Mary's name without the power of attorney and that she could sign the guaranty in her own name. Based on these representations, Lillian signed both contracts. At the conclusion of the trial, the circuit court found that there was no enforceable contract because Lillian was fraudulently induced to execute the original contract in Mary's name. On appeal, the Appellate Court of Maryland stated that "[f]raudulent inducement refers to 'a situation where a person is induced by some fraudulent representation or pretense to execute the very instrument which is intended

to be executed.'" Emphasis added. It occurs when "'one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" Rozen v. Greenberg, 165 Md. App. 665, 674 (2005) (quoting Sec. Constr. Co. v. Maietta, 25 Md.App. 303, 307 (1975)).

52. As discussed, the "inducement" in fraudulent inducement goes to the execution or making of the contract. This is certainly not the case in this case. The plaintiff did not plead anywhere in the Amended Complaint that Mr. Hunt or Mick Unplugged induced the company into executing either the Initial Agreement or the Amended Agreement. Furthermore, the remedy for fraudulent inducement is rescission of the contract. This remedy reflects the wrong done. Since the wronged party was fraudulently induced to execute the contract, the law would allow the wronged party to leave the contract without liability. The plaintiff did not plead that Mr. Hunt or Mick Unplugged induced it, fraudulently or not, into executing either Agreement. The plaintiff also did not seek rescission as its remedy in this Amended Complaint. Rather, the plaintiff sought liquidated damages based on a pro-rated basis going forward.

## COUNT V
## FRAUD

53. Since the plaintiff's effort to pierce Mick Unplugged's corporate veil to reach Mr. Hunt requires that the plaintiff prove fraud, the plaintiff has amended its Complaint in an attempt to show fraud. To do this, the plaintiff simply restated the elements of fraud in Maryland. The plaintiff stated that Mick Unplugged and Mr. Hunt "fraudulently manipulated and misrepresented the number of downloads of the Podcast in order to falsely represent high audience engagement and to manufacture a high national ranking for the Podcast in terms of audience engagement, visibility, and success. Defendants knew that the number of downloads were manipulated and that their representations regarding audience engagement were false. Defendants did this with the intent to mislead Urban One and to obtain larger payments from Urban One under the Podcast License Agreement." The plaintiff continued that "Defendants made misrepresentations regarding the downloads being organic, not manipulated, and being authentic, and made misrepresentations regarding the level of audience engagement with the Podcast, with the intention and expectation that Urban One would rely on those representations during the negotiation of the Amendment." Then, "Urban One justifiably relied on Defendants' misrepresentations in increasing the revenue share to Defendants under the Podcast License Agreement." The plaintiff also alleged that it "justifiably relied on Defendants' misrepresentations in making payments to Defendants larger than what Defendants were entitled to under the Podcast License Agreement." In conclusion, "the downloads and audience engagement metrics were intentionally, fraudulently, and artificially manipulated by Defendants." The plaintiff further alleged that "Defendants agreed in Section 6.3 of

the Podcast License Agreement that such manipulation of download and audience engagement and success metric data would be 'Fraudulent Activity.'" The plaintiff claims to have "been damaged by these fraudulent misrepresentations, including without limitation, by the increased revenue share granted to Defendants under the Amendment and the larger payments to Defendants, which was granted based on Defendants' fraudulent misrepresentations."

54. Interestingly, the plaintiff also alleged that "upon information and belief, Defendants fraudulently manipulated download, audience engagement, and success metrics for the Podcast in the same manner as alleged above, prior to the execution of the Podcast License Agreement." The plaintiff "'justifiably relied" on that download, audience engagement, and success metric data when it originally entered into the Podcast License Agreement and granted Defendants the compensation set forth therein." Finally, the plaintiff claims that it was damaged.

55. In Nails v. S & R, Inc., 334 Md. 398, 415 (1994), the Supreme Court summarized the elements of fraud. In order to recover damages in an action for fraud, a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." Nails v. S & R, Inc., 334 Md. 398, 415 (1994).

56. In Sass v. Andrew, 152 Md.App. 406 (2003), the court expatiated on the tort of fraud, explaining its various elements and relevant aspects. For instance, the court defined a "false representation" as a statement, conduct, or action that intentionally misrepresents a material fact. Citing Parker v. Columbia Bank, 91 Md.App. 346, 359, cert. denied, 327 Md. 524 (1992); Snyder v. Herbert Greenbaum & Associates, 38 Md.App. 144, 148 (1977). A "material" fact is one on which a reasonable person would rely in making a decision. Nevertheless, "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." Maryland Environmental Trust v. Gaynor, 370 Md. 89, 97 (2002). The court continued that a "misrepresentation is generally immaterial if the party to whom it is made reasonably could have ascertained the true facts." See Carozza v. Peacock Land Corp., 231 Md. 112 (1963).

57. The fourth element of a fraud claim requires proof that " the plaintiff relied on the misrepresentation and had the right to rely on it." Nails, 334 Md. at 415. In determining if reliance is reasonable, a court is required to " 'view the act in its setting, which will include the implications and promptings of usage and fair dealing.'" Giant Food v. Ice King, 74 Md.App. 183, 192, cert. denied, 313 Md. 7 (1988) (citations omitted). A strict "but for" analysis is not the exclusive test for the "reliance element" in a fraud claim, however. Nails, 334 Md. at 416, 639 A.2d 660. In fact, "[a]s was said in Kauffman v. Walker, 9 Md. 240. 'Judicial sales will not be set aside for causes that the parties in interest might with a reasonable degree of diligence have obviated." Stewart v. Devries, 81 Md. 525, 32 A. 285 (Md. 1895) And in Ward Development Co., Inc. v. Ingrao, the Supreme Court held that "an action for

fraudulent misrepresentation will not lie for the unfulfillment of promises or the failure of future events to materialize as predicated," citing Delmarva Drill Co. v. Tuckahoe, 268 Md. 417, 427 (1973); Appel v. Hupfield, 198 Md. 374, 379 (1951); see Levin v. Singer, 227 Md. 47 (1961). Ward Development Co., Inc. v. Ingrao, 63 Md.App. 645 (1984).

58. The question is whether the plaintiff acted reasonably in reliance upon what it calls misrepresentation with full belief in its truth and would not have done the thing from which damage resulted had it not been made. According to the Amended Complaint, the plaintiff is a media company that provides content through radio, television, and digital platforms. Mr. Hunt is the host and producer of a podcast entitled "Mick Unplugged." In fact, "Mr. Hunt was introduced to the plaintiff as an up-and-coming podcast talent with a new show concept." And the parties entered into the Initial Agreement on August 27, 2024. According to the plaintiff, "Prior to that date [August 27,], the Podcast had demonstrated purported rapid growth in downloads and audience engagement," suggesting that the plaintiff had performed some due diligence of its own. The plaintiff understood that "Downloads and audience engagement are the primary metrics used to measure a podcast's reach and success." Without more, "Urban One relied on the purported success of the Podcast in entering into negotiations with Defendants to distribute the Podcast on Urban One's platform."

59. Nevertheless, according to the Amended Complaint, in reliance on the download metrics presented by Mick Unplugged, LLC, on August 27, 2024, the parties entered into the Initial Agreement. According to the Complaint, knowing the importance of download and audience engagement data, for the consideration it must

pay under the Agreement, Section 6.3 prohibited Mick Unplugged from artificially and/or fraudulently manipulating download and visibility data. Three months later, however, on or about November 20, 2024, the plaintiff received an unsolicited communication from its third-party analytics partner raising concerns regarding abnormal download and audience engagement behavior relating to the Podcast. The Amended Complaint continued that "the communication raised several red flags related to the download and audience engagement patterns for the Podcast, including: (1) the Podcast had high download counts, but low listener counts; (2) a large number of the downloads of the Podcast were atypically directed to older episodes; and (3) a significant volume of the traffic was attributed to "iTunes," a legacy platform Apple had discontinued in favor of Apple Podcasts." These issues suggested to the plaintiff that the download data for the Podcast were being manipulated to show high growth that did not reflect actual audience engagement.

60. Despite what the plaintiff called red flags, the plaintiff claimed to have raised the issues identified by the third-party analytics partner with Mick Unplugged, LLC, who "represented [that] the unusual volume of downloads of older episodes could be attributed to ongoing guest promotion that Defendants asserted drove traffic to older episodes" and that the plaintiff's "hosting platform was incorrectly reporting Apple traffic as being from iTunes." The plaintiff claimed that it could not test these representations because at that time it did not have access to Apple Podcast analytics.

61. The plaintiff alleged to have "accepted and credited the explanations and representations . . . and continued with the business relationship based on those representations." When the plaintiff was finally given access to the Apple Podcast

analytics (in May 2025), it discovered that in November 2024, three months into the contract, "the Podcast only had 772 engaged listeners even though it had 1.1 million downloads." The plaintiff concluded that the "number of engaged listeners was abnormally low for such a high number of downloads, confirming the concerns raised by" its third-party analytics partner, who was unsolicited.

62. But prior to this May realization, the plaintiff alleged that on or about March 4, 2025, Mick Unplugged indicated that it "had been receiving multiple offers for distribution of the Podcast from other podcast networks, including significant annual guarantees." According to the plaintiff, these discussions alone "violated Urban One's exclusive rights under the" Agreement. Nevertheless, Mick Unplugged further indicated that the compensation provided by the plaintiff under Agreement was "not even close" to third party offers and questioned its decision to join the plaintiff's network. In those March 2025 conversations, according to the plaintiff, Mick Unplugged "relied on the reported high download metrics for the Podcast to justify their demands for greater compensation." Mick Unplugged also expressed interest in starting their own podcast network as a subnetwork on the Urban One platform. To address "Defendants' concerns regarding the [Initial] Agreement, and in express reliance on Defendants' representations regarding the Podcast's high download metrics representing authentic audience engagement and high visibility, the parties entered into negotiations regarding an amendment to the Podcast License Agreement."

63. Knowing everything the plaintiff expressed to have known, on March 28, 2025, the plaintiff still amended the Agreement to lengthen the period of the contract and to increase Mick Unplug's share of the revenue. According to the

Amended Complaint, the plaintiff entered into the Amended Agreement to address Mick Unplugged's "concerns regarding their compensation under the Agreement and in an effort to forge a long-term relationship." The plaintiff did not enter into the Amendment to address what it considered fraud in its transaction. Rather, "[t]he Amendment was executed by Urban One in [continued] reliance on Defendants' representations that the Podcast's download metrics represented authentic audience engagement and visibility." The plaintiff, "expressly relied on Defendants' representations that the download metrics were organic and authentic (i.e., not manipulated or manufactured) in agreeing to the Amendment." This was just two months prior to terminating the Agreement because what it claims to be fraud, according to the plaintiff. In other words, what the plaintiff did not learn between August 2024 and March 2025 about Mick Unplug's abnormal download and audience engagement behavior, the plaintiff learned between March 2025 and May 2025.

64. With an opportunity to address the shortcomings of the Agreement, as the plaintiff saw them, the plaintiff seized the opportunity of the amending process to increase the length of the contract, conduct that is inconsistent with suspicions of fraud and misrepresentation. <u>The Amended Agreement extended the period of the contract to December 31, 2029, and increased Mick Unplugged's "revenue share such that Defendants received seventy percent (70%) of the net revenues from the sale of ads within the Podcast for the audio version and sixty percent (60%) of the net revenues from the sale of ads within the Podcast for the video version."</u>

65. As the number of downloads of the Podcast continued to rise, the plaintiff alleged that it noticed several additional red flags. First, the plaintiff alleged

that it noticed that Mick Unplugged "had no significant public notoriety or media presence prior to launching the Podcast that would explain the rapid and unusual growth shown for the Podcast. Second, the plaintiff also alleged that it noticed that Mick Unplugged's YouTube channel "displayed significantly lower viewership, inconsistent with the audience size suggested by the number of downloads." Third, the plaintiff also alleged to have noticed that Mick Unplugged's "social media accounts grew rapidly in a manner that suggested paid growth strategies." These factors, according to the plaintiff, indicated artificial manipulations of download metrics, and a significant misrepresentation of audience size and influence based on the number of downloads.

66. Hence, on or about May 13, 2025, the plaintiff requested access to Defendants' Apple Podcast analytics, which access would allow for a deeper analysis of the Podcast's analytics, beyond mere download numbers, to evaluate actual audience engagement. Mick Unplugged granted access. The plaintiff then alleged that its "analysis of that data confirmed that the actual listenership for the Podcast was significantly lower than, and inconsistent with, the download metrics." The data and analysis, according to the plaintiff, showed that Mick Unplugged "engaged one or more third party services to artificially increase the download numbers for the Podcast to falsely indicate high audience engagement and visibility for the Podcast."

67. In late May 2025, the plaintiff alleged that it confronted (again) Mick Unplugged regarding the discrepancy between the large number of downloads and low levels of actual audience engagement. According to the plaintiff, Mick Unplugged denied the allegations but "acknowledged using a third-party service called Audience

Lift to artificially enhance the number of downloads of the Podcast." The plaintiff alleged that Mick Unplugged "cutoff Urban One's access to their Apple Podcast analytics." The plaintiff concluded that Mick Unplugged's "manipulation of their downloads for the Podcast breached Section 6.3 of the Agreement and revealed as fraudulent their representations regarding downloads, audience engagement, and visibility of the Podcast."

68. On or about May 30, 2025, the plaintiff (again) contacted Mick Unplugged "to further discuss the discrepancies between actual audience engagement compared to the high number of downloads." A few days later, Mick Unplugged "indicated that they could not continue producing the show based on the April revenue and demanded a sixty-five thousand dollar ($65,000) monthly up front guarantee." According to the plaintiff, Mick Unplugged stated that if the requested guarantee was not received by June 6, 2025, it "would not fulfill their contractual obligations to deliver further episodes under the Agreements."

69. The plaintiff further alleged that (again) on or about June 9, 2025, Mick Unplugged revoked the plaintiff's access to the Apple Podcast analytics, which access had allowed the plaintiff to obtain the analytics related to the Podcast discussed above. And on or about June 11, 2025, Mick Unplugged removed Urban One's branding from the Podcast and replaced it with "Unplugged Studios." Further in violation of the plaintiff's alleged exclusive rights, Mick Unplugged began promoting the Podcast on social media platforms under the "Unplugged Studios" branding instead of the plaintiff's Urban One branding. And on or about June 19, 2025, Mick Unplugged released two episodes of the Podcast on a platform unaffiliated with the plaintiff. In

response to Mick Unplugged's alleged conduct, the plaintiff removed Mick Unplugged's access to Urban One's OMNY distribution platform "out of a concern that Defendants would use their access to remove their prior episodes from that platform." According to the Complaint, on or about June 23, 2025, the plaintiff sent a letter to Defendants to exercise its right to terminate the Agreements.

## CONCLUSION

**WHEREFORE**, the defendants respectfully request that the Court dismiss the plaintiff's Amended Complaint in its entirety as the plaintiff has again failed to state a single claim for which relief can be granted.

Respectfully submitted,

**THE ELIRA LAW FIRM, LLC.**

/s/ Samuel Q. Elira Sr.
Samuel Q. Elira Sr., Esquire
Md Bar No. 22164
5302 East Court Drive.
Upper Marlboro, MD 20772
Bowie, Maryland 20716
(301) 936-1418 (Office)
(301) 936-1432 (Fax)
sqelaw@gmail.com
*Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March 2026 a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties indicated on the electronic filing receipt. A copy of the foregoing will also be delivered by email to the following:

Andrew P. Zappia, Esquire
**TROUTMAN PEPPER LOCKE LLP**
Andrew P. Zappia (MD Bar No: 17406)
70 Linden Oaks, Suite 210
Rochester, NY 14625
Tel.: (585) 270-2102
Email: Andrew.Zappia@troutman.com

Of counsel:
Bryan C. Smith, Esquire (*pro hac vice* to be filed)
**TROUTMAN PEPPER LOCKE LLP**
70 Linden Oaks, Suite 210
Rochester, NY 14625
Tel.: (585) 270-2141
Email: Bryan.Smith@troutman.com
Attorneys for Plaintiff Urban One, Inc.

/s/ Samuel Q. Elira Sr.__________
Samuel Q. Elira Sr., Esquire